JS-3

FILED
CLERK, U.S. DISTRICT COURT

1/20/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ____CW____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

STEVEN NICHOLSON,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: CR 16-00470-CJC

**ORDER DISMISSING WITH PREJUDICE CHARGES AGAINST DEFENDANT STEVEN NICHOLSON FOR VIOLATION OF SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SPEEDY TRIAL ACT (DKT. 159)**

## I.

    The United States Constitution protects our fundamental freedoms and liberties. One of the most important rights guaranteed by the Constitution is the Sixth Amendment right of the accused to a public and speedy trial. It protects against undue and oppressive incarceration before trial and it allows the accused to defend himself against the criminal charges before evidence becomes lost or destroyed and witnesses' memories fade. But the Sixth Amendment protects much more than just the rights of the accused. It also protects the rights of all of us. It gives each of us called for jury service a voice in our

justice system.  And it holds the government accountable to the principles of the Constitution.  Without jury trials, power is abused and liberty gives way to tyranny.[1]

Given the constitutional importance of a jury trial to our democracy, a court cannot deny an accused his right to a jury trial even if conducting one is difficult.  This is true whether the United States is suffering through a national disaster, a terrorist attack, civil unrest, or the coronavirus pandemic that the country and the world are currently facing.  Nowhere in the Constitution is there an exception for times of emergency or crisis.

Nevertheless, the United States District Court for the Central District of California suspended jury trials indefinitely during the coronavirus pandemic, believing it is too unsafe to conduct jury trials even if significant safety precautions are in place.  Most troubling, the Central District's indefinite suspension has continued for 10 months even though the state court across the street from the federal courthouse in Orange County has conducted over 130 jury trials during the pandemic, and all essential businesses in Orange County have remained open and their employees have continued to work.

Defendant Steven Nicholson is one of many defendants before this Court who is challenging the Central District's indefinite suspension of jury trials.  Mr. Nicholson believes that the Central District's indefinite suspension violates his constitutional right to a public and speedy trial under the Sixth Amendment and the Speedy Trial Act.  He is correct.

---

[1] Indeed, Thomas Jefferson once stated, "I consider the trial by jury as the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution."  *From Thomas Jefferson to Thomas Paine,* National Archives (July 11, 1789), *available at* https://founders.archives.gov/documents/Jefferson/01-15-02-0259.

## II.

## A.

Federal courts in the Central District first closed due to the coronavirus pandemic on March 23, 2020.  C.D. Cal. Order of the Chief Judge 20-042, In Re: Coronavirus Public Emergency, Activation of Continuity of Operations Plan (Mar. 19, 2020).  They have not reopened for jury trials in the nearly 10 months since.  *See* C.D. Cal. General Order No. 20-08, In Re: Coronavirus Public Emergency, Order Concerning Phased Reopening of the Court (May 28, 2020) (explaining that jury trials will resume "at a date to be determined").  On August 6, 2020, Chief Judge Philip S. Gutierrez issued an order stating explicitly what had been clear for months—jury trials in the Central District are indefinitely suspended due to the coronavirus pandemic.  C.D. Cal. General Order No. 20-09, In Re: Coronavirus Public Emergency, Order Concerning Phased Reopening of the Court (Aug. 6, 2020) ("Until further notice, no jury trials will be conducted in criminal cases.").

Some courthouse operations have continued during the pandemic.  For example, from June to December, the grand jury—which has at least 16 members—gathered in person, heard witness testimony, and returned 65 indictments.  (*See* Ex. 1, attached to this order.)  Some courts held emergency in-person hearings.  However, on December 7, 2020, the Chief Judge, in consultation with the Central District's Executive Committee, and in light of a coronavirus surge in the region, reactivated the Central District's Continuity of Operations Plan ("COOP").  *See* Order of the Chief Judge 20-179, In Re: Coronavirus Public Emergency, Activation of Continuity of Operations Plan (Dec. 7, 2020).  The Chief Judge's order permitted the grand jury to meet one more time, and then suspended the grand jury—for the first time since June—effective December 9, 2020 at 5:00 p.m. through and including January 8, 2021.  On January 7, 2021, the COOP was

extended through and including January 29, 2021.  Emergency in-person hearings are no longer allowed while the COOP is activated.  And although the order states that "[t]he activation of the COOP Plan is necessary to ensure the continuous performance of essential functions and operations of the Court," the most essential function—conducting jury trials—remains suspended indefinitely.  *Id.* at 2.

Though 10 months have passed since the Central District suspended jury trials, it remains completely uncertain when the Central District will resume them.[2]  The Chief Judge has stated that "decisions on resuming operations are being made in light of state government orders."[3]  Those orders include California Governor Gavin Newsom's four-tier, color-coded system.  That system does not apply to the state judiciary, nor does it restrict essential businesses—in sectors including healthcare, emergency services, food, energy, transportation, and communications—from operating.[4]  Indeed, employees in those sectors have been displaying extraordinary courage and dedication by going to work every day during the pandemic, knowing the risks, while protecting themselves and others as best they can.  They refuse to let the coronavirus prevent them from providing vital services and supplying essential goods to the public.

The Governor's tier system applies only to non-essential businesses.  That system outlines when and how non-essential businesses may operate during the pandemic by

---

[2] The General Order stated that to determine when jury trials will resume, the Chief Judge will use "gating criteria" from the Administrative Office of the United States Courts "designed to determine local COVID-19 exposure risks based on 14-day trends of facility exposure, community spread, and community restrictions."  *Id.* ¶ 2.  Administrative Office of the U.S. Courts, *Federal Judiciary COVID-19 Recovery Guidelines* (Apr. 24, 2020), *available at* https://www.fedbar.org/wp-content/uploads/2020/04/Federal-Judiciary-COVID-19-Recovery-Guidelines.pdf.

[3] Daily Journal, *Central District could soon begin calling jurors in Orange County* (Sept. 23, 2020), *available at* https://www.dailyjournal.com/articles/359682-cental-district-could-soon-begin-calling-jurors-in-orange-county (the "Article").

[4] Blueprint for a Safer Economy, *available at* https://covid19.ca.gov/safer-economy/.

ranking each California county in one of four tiers "based on its test positivity and adjusted case rate."  In tier 1, also known as purple or widespread, many non-essential indoor businesses are closed.  In tier 2, also known as red or substantial, some non-essential indoor businesses are closed.  In tier 3, also known as orange or moderate, some non-essential indoor businesses are open with modifications.  In tier 4, also known as yellow or minimal, most non-essential indoor businesses are open with modifications. The Chief Judge has stated that the Central District will start summoning jurors in Orange County once the county reaches tier 3, and that jury trials will begin approximately 7 weeks later because "that's how long it takes to summon jurors."  (Article at 1.)[5]

Throughout the pandemic, the government has supported the Central District's indefinite suspension of jury trials.  This Court, however, has vehemently opposed it, believing the indefinite suspension is unconstitutional and in violation of the Speedy Trial Act.  The Court has five times asked the Chief Judge to summon jurors for jury trials in cases where defendants refuse to waive further time under the Speedy Trial Act.  All of the Court's requests—including its request in this case—have been denied.[6]

**B.**

Defendant Steven Nicholson was indicted in 2016 with one count of being a felon in possession of a firearm and ammunition.  (Dkt. 1 [Indictment].)  His first trial, which

---

[5] Though Orange County was in tier 2 for months and seemed close to reaching tier 3, it has since moved back to tier 1.  On December 3, 2020, Governor Newsom issued an additional Regional Stay at Home Order requiring "[a]ll individuals living in the Region [to] stay home or at their place of residence except as necessary to conduct activities associated with the operation, maintenance, or usage of critical infrastructure, as required by law, or as specifically permitted in th[e] order."

[6] (Dkt. 157); *United States v. Juan Carlos Recinos*, Case No. 2:19-cr-00724-CJC, Dkt. 58 (Aug. 19, 2020); *United States v. Jeffrey Olsen*, Case. No. 8:17-cr-00076-CJC, Dkt. 68 (Sept. 3, 2020); *United States v. Ronald Bernard Ware*, Case No. 8:20-cr-00110-CJC, Dkt. 38 (Dec. 3, 2020); *United States v. Justin Marques Henning*, Case No. 8:16-cr-00029-CJC-7, Dkt. 1656 (Nov. 25, 2020).

began before Judge S. James Otero on January 23, 2018, resulted in a mistrial.  (Dkts. 62, 66.)  The jury in his second trial, which began on January 30, 2018, found Mr. Nicholson guilty, and Judge Otero sentenced him to a term of 60 months' imprisonment.  (Dkts. 79, 81, 98.)  On April 30, 2020, however, the Ninth Circuit reversed Mr. Nicholson's conviction, finding that Judge Otero had not adequately stated on the record his reasons for denying Mr. Nicholson's request to substitute counsel.  (Dkt. 123.)  Mr. Nicholson's case was then reassigned to this Court, and the mandate issued on May 22, 2020.  (Dkts. 125, 132.)  The Speedy Trial Act requires that Mr. Nicholson's third trial commence no later than January 20, 2021, or his constitutional right to a public and speedy trial will be violated.

On November 2, 2020, at a status conference in this case, Mr. Nicholson's counsel stated that Mr. Nicholson wished to go forward with his trial as scheduled, and that he was unwilling to agree to the exclusion of any further time under the Speedy Trial Act. The government stated that although it was ready for trial, it would have to seek a continuance given the General Order indefinitely suspending criminal jury trials in the Central District.  (*See* Dkt. 162 [Opposition] at 4.)  The Court denied the government's motion to continue the trial from January 5, 2021 to March 2, 2021, and requested that the Chief Judge summon jurors for Mr. Nicholson's January 5, 2021 trial.  (Dkt. 155.) The Chief Judge refused to do so.  (Dkt. 157.)  Mr. Nicholson now moves to dismiss the charges against him, believing that the Central District's indefinite suspension of jury trials violates the Sixth Amendment and Speedy Trial Act.  (Dkt. 159.)[7]

---

[7] Mr. Nicholson is one of at least six defendants before the Court challenging the Central District's indefinite suspension of jury trials.  *See United States v. Juan Carlos Recinos*, Case No. 2:19-cr-00724-CJC; *United States v. Jeffrey Olsen*, Case. No. 8:17-cr-00076-CJC; *United States v. Steven Nicholson*, Case No. 2:16-cr-00470-CJC-1; *United States v. Ronald Bernard Ware*, Case No. 8:20-cr-00110-CJC; *United States v. Justin Marques Henning*, Case No. 8:16-cr-00029-CJC-7; *United States v. Jose Reyes*, Case No. 2:19-cr-00740-CJC.

### III.

"The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of [people], at all times, and under all circumstances." *Ex parte Milligan*, 71 U.S. 2, 120–21 (1866).  It "is not to be obeyed or disobeyed as the circumstances of a particular crisis in our history may suggest." *Downes v. Bidwell*, 182 U.S. 244, 384 (Harlan, J., dissenting).  It "has no provision lifting restrictions upon governmental authority during periods of emergency." *Dennis v. United States*, 341 U.S. 494, 520 (1951) (Frankfurter, J., concurring).  Rather, "[t]he People have decreed that it shall be the supreme law of the land at all times." *Id.* Its "full operation cannot be stayed by any branch of the government in order to meet what some may suppose to be extraordinary emergencies." *Downes*, 182 U.S. at 385 (Harlan, J., dissenting).  This is because the drafters "foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law." *Milligan*, 71 U.S. at 120.

The principle that "[g]overnment is not free to disregard the [Constitution] in times of crisis" applies in full force during this pandemic. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020) (Gorsuch, J., concurring).  Recently, the Supreme Court recognized this fundamental principle and enjoined the enforcement of an executive order issued by the Governor of New York imposing occupancy restrictions on attendance at religious services in areas heavily affected by coronavirus.  It stated powerfully that "even in a pandemic, the Constitution cannot be put away and forgotten." *Id.* at 68 (majority opinion).  In its analysis of the applicants' likelihood of success on the merits, the Supreme Court found it problematic that houses of worship—spaces where people practice their constitutional right to the free exercise of religion—faced more

restrictions than businesses categorized as "essential." *Id.* at 66–67.  The Supreme Court recognized that "[s]temming the spread of COVID-19 is unquestionably a compelling interest," but ultimately concluded that effectuating the First Amendment's guarantees likely requires facing risks of infection while taking proper safety precautions rather than trying to avoid the risks altogether. *Id.* at 67.

The Supreme Court has granted similar applications for relief in cases challenging other states' restrictions on religious spaces—including the Governor of California's tier system—and remanded for further consideration in light of *Roman Catholic Diocese.* *See Harvest Rock Church v. Newsom*, 2020 WL 7061630, at *1 (U.S. Dec. 3, 2020)[8]; *High Plains Harvest Church v. Polis*, 141 S. Ct. 527 (2020) (remanding challenge to Colorado restrictions in light of *Roman Catholic Diocese*).  *Roman Catholic Diocese* has also changed how the Ninth Circuit addresses constitutional challenges to restrictions enacted in response to the pandemic.  *Dayton Valley v. Sisolak*, 982 F.2d 1228, 1232–33 (9th Cir. Dec. 15, 2020) (concluding that *Roman Catholic Diocese* compelled the court to conclude that church was likely to succeed on its challenge to occupancy limitations under Free Exercise Clause); *see S. Bay United Pentecostal Church v. Newsom*, 981 F.3d 765, 766 (9th Cir. 2020) (vacating district court's order denying motion for injunctive relief filed by South Bay United Pentecostal Church and remanding for further consideration in light of *Harvest Rock Church* and *Roman Catholic Diocese*).

The right to freely exercise religion, however, is not the only constitutional right that must be protected during the pandemic.  The right to a speedy and public jury trial must also be protected.  The Sixth Amendment provides that "[i]n all criminal

---

[8] In *Harvest Rock Church*, both the district court and the Ninth Circuit had concluded that the church in question failed to show a likelihood of success on the merits of its free exercise challenge to California's restrictions on religious service attendance, citing evidence in the record regarding the risk of spreading the coronavirus in indoor congregate activities.  *See Harvest Rock Church, Inc. v. Newsom*, 977 F.3d 728, 730–31 (9th Cir. 2020).

prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."  U.S. Const. amend. VI; *see* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury.").  The right to a speedy trial "has roots at the very foundation of our English law heritage" and "is one of the most basic rights preserved by our Constitution."  *Klopfer v. State of N.C.*, 386 U.S. 213, 224, 226 (1967).  Indeed, "[e]xcept for the right of a fair trial before an impartial jury, no mandate of our jurisprudence is more important" than a defendant's right to a speedy trial.  *Furlow v. United States*, 644 F.2d 764, 769 (9th Cir. 1981).  The Sixth Amendment protects defendants by minimizing oppressive pretrial incarceration and ensuring evidence needed to prove the defense remains available at the time of trial.  *See Klopfer*, 386 U.S. at 222; *id.* at 226–27 (Harlan, J., concurring); *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986).  It also protects the public by giving the people a voice, ensuring the government has the evidence needed to prosecute, and holding leaders accountable to the Constitution.  *See Barker v. Wingo*, 407 U.S. 514, 519 (1972) ("In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused."); *United States v. Lloyd*, 125 F.3d 1263, 1268 (9th Cir. 1997) ("[T]he right to a speedy trial belongs not only to the defendant, but to society as well."); *United States v. Caparella*, 716 F.2d 976, 981 (2d Cir. 1983) ("It must be remembered that a speedy trial is not only viewed as necessary to preserve the rights of defendants. Just as significant is the protection it accords to society's interest in bringing criminals to justice promptly.").

   "The guaranty of trial by jury contained in the Constitution was intended for a state of war as well as a state of peace; and is equally binding upon rules and people, at all times and under all circumstances."  *Milligan*, 71 U.S. at 3.  The constitutional right "d[oes] not yield to emergency."  *Nebbia v. People of New York*, 291 U.S. 502, 545 (1934) (describing the holding in *Milligan*).  Courts must always be vigilant to protect

and enforce it.  They cannot, as the Central District has done here, shelter in place and suspend it.  *See Roman Catholic Diocese*, 141 S. Ct. at 71 (Gorsuch, J., concurring) ("[W]e may not shelter in place when the Constitution is under attack.").   Indeed, courts have "[n]o higher duty . . . than to exert [their] full authority to prevent all violation of the principles of the Constitution."  *Downes*, 182 U.S. at 382 (Harlan, J., dissenting).

## A.

The government asserts that the Speedy Trial Act permits the Central District's indefinite suspension of jury trials.  But nothing in the Speedy Trial Act excuses the Central District's indefinite suspension.  Congress enacted the Speedy Trial Act in 1974 in order to make effective the Sixth Amendment's guarantee of a speedy trial.  Pub. L. No. 93-619; *see Furlow*, 644 F.2d at 798–69 (describing the Speedy Trial Act as the Sixth Amendment's "implementation").  The Act requires that a defendant's trial begin within 70 days of the filing of the indictment or the defendant's initial court appearance, whichever is later.  18 U.S.C. § 3161(c)(1).  "The Act recognizes, however, that legitimate needs of the government and of a criminal defendant may cause permissible delays."  *United States v. Daychild*, 357 F.3d 1082, 1090 (9th Cir. 2004).  The government argues that two types of permissible delay are relevant here.

First, the Speedy Trial Act provides that certain periods of time may be excluded from the 70-day deadline.  For example, a court may exclude periods of delay resulting from competency examinations, interlocutory appeals, pretrial motions, the unavailability of essential witnesses, and delays to which the defendant agrees.  18 U.S.C. § 3162(h)(1)–(6).  The specific category of excludable delay relevant here is a sort of catchall category allowing exclusion of time when a judge finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3162(h)(7)(A).  Congress intended the "ends of justice"

provision to be "rarely used." *United States v. Nance*, 666 F.2d 353, 355 (9th Cir. 1982) (quoting the Act's legislative history).  To ensure that broad discretion does not undermine the Act's important purpose, Congress enumerated factors that courts must consider in determining whether to grant an "ends of justice" continuance.  *Id.*; *see United States v. Clymer*, 25 F.3d 824, 829 (9th Cir. 1994) (explaining that "the 'ends of justice' exclusion . . . may not be invoked in such a way as to circumvent the time limitations set forth in the Act").  Those factors include "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice."  18 U.S.C. § 3161(h)(7)(B)(i).

Second, the Speedy Trial Act provides that when a defendant is to be retried following an appeal, the court retrying the case may extend the period for retrial from 70 days up to 180 days "if unavailability of witnesses or other factors resulting from passage of time shall make trial within seventy days impractical."  18 U.S.C. § 3161(e).  "The Speedy Trial Act does not itself provide standards for determining when a factor results from the passage of time or even when such a factor renders trial impractical . . . suggest[ing] that Congress intended to afford experienced trial judges considerable discretion in making such determinations."  *United States v. Shellef*, 718 F.3d 94, 105 (2d Cir. 2013).  Determinations of whether holding a trial is impractical are therefore subject to "case-by-case review rather than . . . categorical pronouncements."  *Id.*

Contrary to the government's assertion, neither of these provisions justifies the Central District's indefinite suspension of jury trials during this pandemic.

//

//

//

**1.**

Continuances under the "ends of justice" exception are appropriate if without a continuance, holding the trial would be *impossible*.  18 U.S.C. § 3161(h)(7)(B)(i).  This exception has been used in response to natural disasters and other exigencies, but only where the triggering exigency made the criminal jury trial a physical and logistical impossibility.  In *Furlow*, the Ninth Circuit upheld a district court's order finding 14 days excludable where Mount Saint Helens erupted 2 days before the scheduled trial date.  644 F.2d at 767–69.  The court began its discussion by noting that "[a] close reading of the Speedy Trial Act . . . reveals no reference to the interruptions of nature."  *Id.*  However, the court explained that the eruption created a "cloud of volcanic dust," and was an incident "of worldwide significance" and "earth-shaking effect" that inflicted a "paralyzing impact on surrounding geographies, including the location of the court where the [defendant] was scheduled for trial."  *Id.* at 767.  The eruption "obviously interrupted transportation [and] communication," and "affect[ed] the abilities of jurors, witnesses, counsel, [and] officials to attend the trial."  *Id*. at 767–68.  Since physical circumstances precluded holding a jury trial, and "[t]he district court preserved the procedural safeguards and specified a trial date rather than a *sine die* continuance," the court held that the 14-day continuance did not result in a speedy-trial violation.  *Id.* at 769.

Similarly, a New York district court applied the ends of justice exception to exclude a 20-day period after the September 11, 2001 terrorist attacks.  *United States v. Correa*, 182 F. Supp. 2d 326, 327 (S.D.N.Y. 2001).  In that case, the pretrial conference had been set for September 11, 2001, less than half a mile from the World Trade Center.  *Id.*  However, after the attacks, the courthouse was evacuated and the jail where the defendant was detained was locked down for security reasons.  *Id.*  The courthouse, United States Attorney's office, and jail were "closed to all non-emergency personnel for nearly a week."  *Id.*  Even when they reopened, telephone, fax, and internet access were

disrupted at all three locations.  *Id.*  Lawyers without access to their offices were less able to communicate effectively with the court and other counsel.  *Id.*  Law enforcement agents, including those working on that specific case, were "massively redeployed to emergency service work and the pressing needs of the terrorist attack."  *Id.*  "Security concerns and staffing difficulties at the [jail], which ha[d] also suffered dislocation of critical electronic and communications systems, [made] it virtually impossible, and clearly imprudent, to transport prisoners to [c]ourt."  *Id.*  Given that these numerous complications made holding a jury trial actually impossible, the court concluded that the ends of justice would be served by excluding the 20-day period after the attacks.[9]

Although there is no question that the current pandemic is serious, conducting a jury trial during the pandemic is clearly not impossible.  Unlike in the cases where the ends of justice exception has been applied in the wake of a natural disaster or other exigency, travel and communications continue to function.  *See Furlow*, 644 F.2d at 767–69; *Correa*, 182 F. Supp. 2d at 327.  Some aspects of the practice of law may be less convenient during this time, but it remains possible to perform necessary trial preparations, access the courthouse, and conduct the trial.[10]  *See Furlow*, 644 F.2d at 767–69; *Correa*, 182 F. Supp. 2d at 327.

Indeed, if one had any doubt about the possibility of conducting a jury trial during the pandemic, one need look no further than the state court across the street from the

---

[9] Other cases confirm that *actual impossibility* is key to applying the ends of justice exception.  *See United States v. Richman*, 600 F.2d 286, 294 (1st Cir. 1979) (finding no Speedy Trial Act violation where trial was continued three weeks after the "paralyzing . . . Blizzard of '78" that made it so that "[t]rial could not commence on" the scheduled date); *United States v. Scott*, 245 Fed. Appx. 391 (5th Cir. 2007) (concluding without substantial analysis that there was no Speedy Trial Act violation where some delay was attributable to Hurricane Katrina).

[10] Sufficient courthouse staff are also available to facilitate a trial.  Indeed, Mr. Nicholson's status on bond means that even less courthouse staff will be required to facilitate his trial than would be needed to hold a trial for a defendant in custody.

Orange County federal courthouse where Mr. Nicholson's retrial would have occurred had the Central District not prohibited it.  The Orange County Superior Court resumed jury trials, with appropriate precautionary measures, *nearly 8 months ago*.  The state court did not hold any criminal jury trials in April or May of 2020 because of the pandemic.  However, from June to the middle of November 2020, it held 130 jury trials, including both criminal and civil jury trials.  (*See* Exs. 2 and 3, attached to this order.) Notably, a consistent 50–60% of potential Orange County jurors have been reporting to fulfill their civic duty during this time.  (*Id.*)

Make no mistake, the Orange County Superior Court has faced and continues to face many challenges when conducting jury trials during the pandemic.  There have been and will be delays in the trial proceedings whenever a defendant, a witness, an attorney, or a juror tests positive for the coronavirus and has to be quarantined.[11]  But the Orange County Superior Court has managed and continues to manage the challenges of conducting a jury trial during the pandemic, protecting everybody associated with the jury trials the best that it can.[12]  It has never occurred to the Orange County Superior Court to surrender to those challenges and indefinitely suspend the Sixth Amendment.

---

[11] In light of the recent surge in coronavirus cases in Orange County, the Orange County Superior Court decided to extend the statutory time period for holding criminal jury trials "by not more than 30 days in cases in which the statutory deadline otherwise expire from January 11, 2021 to February 5, 2021." (Ex. 4, attached to this order.)  The Orange County Superior Court extended the statutory deadline for this limited period to avoid having to dismiss a case if an in-custody defendant could not be transported to the courthouse because of a quarantine at the Santa Ana Jail, or if it turns out there is a temporary shortage of jurors.  The Orange County Superior Court, however, fully intends to hold criminal jury trials during the surge.  In stark contrast, the Central District indefinitely suspended them long before the surge, in fact nearly 10 months before it.

[12] The Orange County Superior Court has accomplished this by taking numerous careful measures to ensure safety.  It accommodates social distancing by staggering times for juror reporting, trial start, breaks, and concluding for the day, seating jurors during trial in both the jury box and the audience area, marking audience seats, and using dark courtrooms as deliberation rooms.  It also regularly disinfects the jury assembly room and restrooms, provides facial coverings, uses plexiglass shields in courtrooms, and requires trial participants to use gloves to handle exhibits.  (*Olsen*, Case No. 8:17-cr-00076-CJC, Dkt. 67, Ex. 2 at 1–10, 13–25, 34.)  Of course, similar safety precautions would have been in place for Mr. Nicholson's retrial had the Central District allowed this Court to hold one.

Quite frankly, the Court is at a loss to understand how the government can continue to support the Central District's indefinite suspension of jury trials when the government itself has convened the grand jury in the very same courthouse where Mr. Nicholson's retrial would have occurred had the Central District not prohibited it.  From June 24, 2020 through December 9, 2020, the grand jury—which has at least 16 people on it—regularly convened in person in the very Orange County federal courthouse in which Mr. Nicholson seeks to have his jury trial.  The grand jury heard testimony from witnesses, deliberated together, and returned 65 indictments in that time with no coronavirus outbreak.  (*See* Ex. 1.)  Nevertheless, the government somehow contends that it was impossible to conduct a jury trial during all of these months in the exact same courthouse.[13]

The government continues to cite the Chief Judge's General Order to support its position that the ends of justice exception should be applied to exclude further time under the Speedy Trial Act.  The government's continued reliance on the General Order is misplaced.  The General Order—issued after a majority vote of district judges in this district—does not say that conducting a jury trial is *impossible*.  Rather, it states only that the pandemic has rendered conducting jury trials *unsafe*.  The General Order and the government note that people continue to be infected, hospitalized, and—tragically—die due to the coronavirus, and that holding jury trials will likely put people at an increased risk of contracting the coronavirus.  C.D. Cal. General Order No. 20-09 ¶ 6.a.  The Court, of course, acknowledges the public health risk the coronavirus poses to people.  *See Roman Catholic Diocese*, 141 S. Ct. at 68 ("Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and

---

[13] Tellingly, although the Central District suspended the grand jury citing dangers posed by the recent surge, its suspension was not immediate.  Rather, the Central District suspended the grand jury effective two days after the date of the Central District's order—just enough time for the grand jury to convene in person one last time before the suspension, despite the dangers cited, and return 6 additional indictments.  (*See* Ex. 1.)

responsibility in this area.").  The Court also is acutely aware of the statistics of how many people continue to be infected, hospitalized, and—tragically—die due to the coronavirus every day, all across the country.  But the Constitution does not turn on these considerations.  Instead, to protect the fundamental right to a speedy trial guaranteed by the Sixth Amendment, the Constitution requires that a trial only be continued over a defendant's objection if holding the trial is *impossible*.  And holding Mr. Nicholson's retrial during the pandemic is not impossible.  The Orange County Superior Court has proven this to be the case.

Particularly troubling, the General Order's suspension of jury trials is indefinite.  The Order states that the Central District will determine when to resume jury trials using "gating criteria [that] is designed to determine local COVID-19 exposure risks based on 14-day trends of facility exposure, community spread, and community restrictions."  C.D. Cal. General Order 20-09 ¶ 2.  However, the Ninth Circuit has repeatedly admonished that "an ends of justice exclusion must be 'specifically limited in time.'"  *United States v. Ramirez-Cortez*, 213 F.3d 1149, 1154 (9th Cir. 2000) (quoting *Lloyd*, 125 F.3d at 1268); *see Furlow*, 644 F.2d at 769 (noting that a *sine die* continuance would be unacceptable).  In keeping with this requirement, the periods of time courts excluded under the Speedy Trial Act due to previous natural disasters and other exigencies were brief and definite.  *See Furlow*, 644 F.2d at 768 (14 days); *Correa*, 182 F. Supp. 2d at 329 (20 days); *Richman*, 600 F.2d at 294 (3 weeks).  In contrast, even after *10 months* without jury trials, the Central District's suspension of jury trials remains indefinite.  The gating criteria—which are completely untethered to the constitutional implications of a criminal defendant's right to a speedy trial—do not make sufficiently certain what is otherwise an unacceptably uncertain end date.

Moreover, an "ends of justice" exclusion must be justified with reference to specific factual circumstances in the particular case as of the time the delay is ordered.

*Ramirez-Cortez*, 213 F.3d at 1154 (concluding that an ends of justice continuance was not sufficiently justified where the judge made no inquiry into the actual need for a continuance in the particular case, instead checking off boxes on pre-printed forms without making findings on statutory factors, and the record showed that the judge "was granting blanket continuances").  By its very nature, the General Order does not justify delays as of the time they are ordered in any particular case.  *See United States v. Pollock*, 726 F.2d 1456, 1461 (9th Cir. 1984) (stating that the "ends of justice" exclusion "was to be based on specific underlying factual circumstances" and "cannot be invoked without specific findings in the record").  Simply stated, the General Order is repugnant to the Sixth Amendment and contrary to the "ends of justice."

Nor does the California Governor's color-coded tier system fix the constitutional problems with the Central District's indefinite suspension of jury trials.  Apparently, the Central District is now relying on that system to determine when jury trials will resume.  That system is for non-essential businesses.  It does not apply to state courts, let alone federal courts.  *See Roman Catholic Diocese*, 141 S. Ct. at 69 (Gorsuch, J., concurring) (denouncing the assumption that what happens in constitutionally protected spaces "just isn't as 'essential' as what happens in" other spaces).  The California Governor's color-coded tier system is of no consequence to the constitutional analysis here.  "Courts and their procedural safeguards are indispensable to our system of government." *Duncan v. Kahanamoku*, 327 U.S. 304, 322 (1946).  The constitutional right to a public and speedy trial is and always will be essential.[14]

---

[14] Recently, the Chief Judge of the Ninth Circuit, Sidney R. Thomas, recognized that the operations of the federal court, including conducting jury trials, are essential.  In a letter to the Governor of California requesting that all federal judges and employees in California, including those in the Central District, be included in the state's early priority phase of the coronavirus vaccination program, Chief Judge Thomas stated the judges and employees are "frontline" workers who perform essential constitutional functions and that they work "in courtrooms and in chambers where they have regular contact with court users, jurors and the public as they perform their essential duties."

In the Court's view, it is not a question of *if* the Court should have held Mr. Nicholson's criminal jury trial during the coronavirus pandemic, but a question of *how* the Court should have held it.  If it is not impossible to hold criminal jury trials in the state court across the street from the federal courthouse where Mr. Nicholson seeks to be tried, it was clearly not impossible to hold a criminal jury trial for Mr. Nicholson.  The right to a speedy trial is one of the most basic and important rights preserved by our Constitution.  *Klopfer*, 386 U.S. at 224; *Furlow*, 644 F.2d at 769.  The Central District never should have denied him his right to one.

**2.**

Extensions under the Speedy Trial Act may also be warranted when holding an earlier trial is "impractical."  The Speedy Trial Act allows courts to extend the period for a retrial after appeal from 70 to up to 180 days "if unavailability of witnesses or other factors resulting from passage of time shall make trial within seventy days impractical." 18 U.S.C. § 3161(e).  The government does not argue that any witnesses are unavailable or provide any reason particular to this case why holding Mr. Nicholson's retrial within 70 days is impractical.  Indeed, the government admitted that if the Central District had summoned jurors for the retrial, it would have been ready to proceed.

The government relies only on the pandemic to argue that holding Mr. Nicholson's retrial at this time is impractical.  However, the challenges of the pandemic do not make conducting Mr. Nicholson's retrial within 70 days impractical.  As previously explained, it is not impossible to hold a retrial during the pandemic.  It is also not impractical to do so.  The Constitution does not succumb to considerations of safety, risk, and difficulty. *See Roman Catholic Diocese*, 141 S. Ct. at 67–68; *Downes*, 182 U.S. at 384 (Harlan, J., dissenting).  Even if it is difficult to effectuate the Constitution's guarantees, courts must

confront and overcome those difficulties, not surrender to them.  *See Milligan*, 71 U.S. at 3.[15]

That is precisely what the Orange County Superior Court and providers of essential services in Orange County have done for months now.  After closing for two months at the beginning of the pandemic, the Orange County Superior Court held over 130 jury trials and continues to conduct them.  (*See* Exs. 2–4.)  The Internal Revenue Service, the Social Security Administration, and other federal agencies in Orange County have been open and their employees have continued to work.  Police, firefighters, and other first responders in Orange County have all continued to work.  Hospitals and medical offices in Orange County have been open to patients and the medical professionals have continued to work.  Grocery stores, hardware stores, and all essential businesses in Orange County have been open and their employees have continued to work.[16]  Yet the federal courthouse in Orange County somehow still remains indefinitely closed for jury trials.

---

[15] Not surprisingly, the Central District's suspension of jury trials has taken its toll on the fair administration of justice in the district.  A growing backlog in trials and sentencings has led to such severe overcrowding in jails that people charged with crimes in California, with families and lawyers in California, are being transported without notice to Arizona because there is simply no longer bed space in the Central District to house them.  *See, e.g.*, *United States v. Joshua Jenkins*, Case No. 2:20-cr-00068-CJC-1, Dkt. 41 (September 2, 2020 Order granting immediate transfer from Arizona back to California).  These moves impede not only defendants' right to a speedy trial, but also their right to effective assistance of counsel.  Even more disturbing is the fact that the government is now offering favorable deals to defendants to incentivize them to plead guilty.  Due to high pretrial and pre-sentencing caseloads, it has authorized AUSAs to offer two-level variances under the Sentencing Guidelines to many defendants so long as they waive their right to in-person hearings, and sign plea agreements and enter pleas quickly.  *See, e.g.*, *United States v. Manuel Ignacio Ruiz*, Case No. 5:20-cr-00019-CJC-6, Dkt. 540 (September 17, 2020 plea agreement).  In other words, the government is now offering very favorable plea deals based not on the defendant's individual circumstances, but rather on exigencies manufactured by the Central District's refusal to resume jury trials during the pandemic.

[16] Even under the Governor's recent Regional Stay At Home Order, schools and childcare in Orange County remain open with precautions, shopping centers and retail stores operate with limited capacity, and outdoor recreational facilities are open for physically distanced outdoor exercise.

If it is not impractical for the Orange County Superior Court to conduct over 130 jury trials, and if it is not impractical for every essential business in Orange County to remain open and for their employees to continue to work, it is not impractical to hold a jury trial for Mr. Nicholson.  Admittedly, the pandemic creates numerous challenges to conducting a jury trial.  There will be starts and stops.  There will be delays.  Significant attention and caution will have to be devoted to safety and protection.  But none of those challenges justify the Central District's indefinite suspension of a constitutional right.  "Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical."  *Roman Catholic Diocese*, 141 S. Ct. at 70 (Gorsuch, J., concurring).[17]

## B.

In light of the Central District's violation of Mr. Nicholson's constitutional right to a public and speedy trial, the question then becomes what the remedy should be for the Central District's violation.  The law is clear on this issue.  When a defendant is not brought to trial within the 70-day time limit (minus all properly excludable periods of delay) and brings a motion to dismiss, the court *must* dismiss the indictment.  18 U.S.C. § 3162(a)(2); *see United States v. Medina*, 524 F.3d 974, 980 (9th Cir. 2008); *Lloyd*, 125 F.3d at 1265 ("If retrial following an appeal does not commence within seventy days, not counting excludable delays, the indictment must be dismissed either with or without prejudice."); *United States v. Tertrou*, 742 F.2d 538, 540 (9th Cir. 1984) (explaining that if Congress' strict time requirements in the Speedy Trial Act "are not met, the courts have no discretion but to dismiss").  The strictness of this remedy highlights the importance of

---

[17] If the Central District had permitted this Court to hold Mr. Nicholson's retrial during the recent surge in coronavirus cases in Orange County, the Court might have had to take several days to conduct jury selection or perhaps even postpone it for a few weeks if it turned out there was a temporary shortage of jurors.  But this is all academic now.  The Central District has indefinitely suspended jury trials and has no intention of resuming them until Orange County reaches tier 3, when some non-essential businesses can open indoors with modifications.  One can only speculate when the Central District will resume jury trials, but it is an absolute certainty that the Central District will not be resuming them any time soon.

the right it protects.  *See Lloyd*, 125 F.3d at 1268 ("Congress designed the Speedy Trial Act in part to protect the public's interest in the speedy administration of justice, and it imposed the sanction of dismissal under § 3162 to compel courts and prosecutors to work in furtherance of that goal.").  The Court therefore has no choice but to dismiss the indictment against Mr. Nicholson.

The only question remaining is whether to dismiss the indictment with or without prejudice.  "In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: [1] the seriousness of the offense; [2] the facts and circumstances of the case which led to the dismissal; and [3] the impact of a reprosecution on the administration of this chapter and on the administration of justice."  18 U.S.C. § 3162(a)(2).[18]  A court's decision of whether to dismiss the charges with or without prejudice depends on a "careful application" of these factors to the particular case.  *Clymer*, 25 F.3d at 831.

Admittedly, the first factor—the seriousness of the offense—weighs in favor of a dismissal without prejudice.  Though the crime of which Mr. Nicholson is accused— being a felon in possession of a firearm—is far from the most serious of federal crimes, it is still serious.  *See Medina*, 524 F.3d at 986–87 (explaining that serious crimes weigh in favor of dismissal without prejudice).  Mr. Nicholson concedes as much.  (*See* Mot. at 6 [arguing that the alleged offense is "serious, but that is not determinative")].)  And as the Court explained at the first sentencing, the firearm Mr. Nicholson possessed "had a magazine capable of holding 31 bullets," and "is the type of weapon that can be used to

---

[18] Both the government and Mr. Nicholson provide the Court with a separate analysis to determine whether Mr. Nicholson's Sixth Amendment right was violated (as opposed to his rights under the Speedy Trial Act).  They cite *Barker v. Wingo*, a case decided before the Speedy Trial Act was enacted, which explains that courts should balance the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  407 U.S. at 530; *see Doggett v. United States*, 505 U.S. 647, 651 (1992).  The analysis of these factors parallels the analysis the Court makes under the Speedy Trial Act so there is no need for the Court to conduct a separate analysis.

harm or hurt or kill many people at one time." (Dkt. 119.)  However, this factor does not outweigh the other two factors the Court must consider.

Most important in this case are the facts and circumstances leading to dismissal. The Central District decided to indefinitely suspend jury trials during this pandemic. Faced with the question of whether to continue that policy, it has time and again decided to do so.  It made its decisions knowing that holding a jury trial in Orange County is possible.  It made its decisions knowing that the Orange County Superior Court is able to conduct jury trials.  It made its decisions knowing that a grand jury convened in the Orange County federal courthouse for months during the pandemic with no reported coronavirus outbreak.  It made its decisions knowing that all essential service providers and businesses have remained open and their employees continue to work.  Its decisions were knowingly and willfully made.  The primary factor driving the Central District's decision is the risk that people might get sick from the coronavirus.  But its decision was made with little or no regard for the constitutional right to a public and speedy trial. Indeed, in his order denying the Court's request to summon jurors for Mr. Nicholson's trial (and the orders he cites therein), the Chief Judge made no mention of the Constitution at all.

The Central District's constitutional violation was also not merely technical.  *See Medina*, 524 F.3d at 987 (affirming dismissal without prejudice where district court found the violations of the Speedy Trial Act were "technical, rather than substantive"). Nor was it isolated and unwitting.  *See United States v. Taylor*, 487 U.S. 326, 342 (1988) (indicating that dismissal with prejudice is appropriate where there is "something more than an isolated unwitting violation"); *Medina*, 524 F.3d at 987 (explaining that a "culture of poor compliance" with the Speedy Trial Act would weigh in favor of dismissing with prejudice); *United States v. Ramirez*, 973 F.2d 36, 39 (1st Cir. 1992) ("The expansiveness of such a STA violation risk makes it important for a court to

correct for the sake of deterrence and more painstaking vigilance.").  Rather, it was a substantive policy decision—reimplemented each time it was reconsidered—to suspend the constitutional rights of Mr. Nicholson and every other defendant unwilling to waive time.  *See Taylor*, 487 U.S. at 339 (finding that even "a truly neglectful attitude" toward the Speedy Trial Act could weigh in favor of dismissing with prejudice); *Medina*, 524 F.3d at 987; *Ramirez*, 973 F.2d at 39 (explaining that violations "caused by the court or the prosecutor" weigh in favor of granting a dismissal with prejudice).

Finally, barring reprosecution in this case by dismissing with prejudice is the only sanction with enough teeth to create any hope of deterring additional delay in the resumption of jury trials and avoiding further dismissals of indictments for violations of defendants' constitutional rights to a public and speedy trial.  *See Taylor*, 487 U.S. at 342 ("It is self-evident that dismissal with prejudice always sends a stronger message than dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays.").  A dismissal without prejudice, on the other hand, allows the government simply to go before the grand jury, obtain a new indictment, and proceed as if no constitutional violation ever occurred.  *See* 18 U.S.C. § 3288 (permitting the government to obtain a new indictment within six calendar months of the date of the dismissal, "which new indictment shall not be barred by any statute of limitations"); *United States v. Bert*, 814 F.3d 70, 86 (2d Cir. 2016) ("The fact that the government must reindict the defendant is not a particularly strong deterrent.").  In effect, there would be no adverse consequences from the Central District's knowing and willful decision to violate Mr. Nicholson's constitutional right to a public and speedy trial.  Such a meaningless result would "send exactly the wrong signal" and foster in the future "a cavalier regard, if not a concerted disregard" of the Constitution.  *Ramirez*, 973 F.2d at 39; *see Bert*, 814 F.3d at 86 (encouraging courts to consider "the likelihood of repeated

violations and whether there are potential administrative changes prompted by this violation").[19]  This Court will not let that happen.

## IV.

Federal judges are given lifetime appointments to support and defend the Constitution and laws of the United States.  They must never abandon them.[20]  In this case, the Central District's indefinite suspension of jury trials during the coronavirus pandemic violated Mr. Nicholson's right to a public and speedy trial under the Sixth Amendment and the Speedy Trial Act.  Accordingly, this Court now must dismiss the charges against Mr. Nicholson, and dismiss them with prejudice.

DATED:      January 20, 2021

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[19] That the district judges and the government did not act with malice does not change this analysis.  *See Ramirez*, 973 F.2d at 39 ("Even though the oversight was accomplished without malice, that does not ameliorate the gravity of its effects."); *Bert*, 814 F.3d at 80 (affirming that "a finding of 'bad faith' is not a prerequisite to dismissal with prejudice").

[20] To quote George Washington, "The Constitution is the guide which I never will abandon."  From George Washington to Boston Selectmen, National Archives (July 28, 1795), *available at* https://founders.archives.gov/documents/Washington/05-18-02-0305.

# EXHIBIT 1

| | | | | |
|---|---|---|---|---|
|  | **INDICTMENTS RETURNED IN SOUTHERN DIVISION**<br>**June 24, 2020 through December 9, 2020** |
| | **Date Indictment Filed** | **Case Number** | **Case Name** | **Notes** |
| 1 | June 24, 2020 | 8:20-cr-00077-JLS | USA v. Martinez, et al. | |
| 2 | | 8:20-cr-00078-DOC | USA v. Jorgo | |
| 3 | | 8:20-cr-00079-JVS | USA v. Staples | |
| 4 | | 8:20-cr-00002(A)-DOC | USA v. Le, et al. | 1st Superseding Indictment |
| 5 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 6 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 7 | | 5:20-cr-00123-JGB | USA v. Renteria | |
| 8 | | 5:20-cr-00124-JGGB | USA v. Gil-Carranza, et al. | |
| 9 | | 8:20-cr-00083-DOC | USA v. Do | |
| 10 | | 8:20-cr-00084-DOC | USA v. Tran, et al. | |
| 11 | July 22, 2020 | 8:20-cr-00091-JVS | USA v. Memije | |
| 12 | | 5:20-cr-00132-JGB | USA v. Moore, et al. | |
| 13 | | 8:20-cr-00090-JLS | USA v. Nunez | |
| 14 | | 8:20-cr-00089-JLS | USA v. Rangel | |
| 15 | | 2:19-cr-00756(A)-JAK | USA v. Ryan, et al. | 1st Superseding Indictment |
| 16 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 17 | | 8:20-cr-00097-JLS | USA v. Villa | |
| 18 | | 5:20-cr-00138-PA | USA v. Garcia | |
| 19 | | 8:19-cr-00208(A)-DOC | USA v. Pongsamart | 1st Superseding Indictment |
| 20 | | 8:20-cr-00098-JLS | USA v. Gonzalez | |
| 21 | August 12, 2020 | 8:20-cr-00104-DOC | USA v. Flores | |
| 22 | | 8:20-cr-00105-JVS | USA v. Fernandez | |
| 23 | | 8:20-cr-00106-JVS | USA v. Spagnolini | |
| 24 | | 8:20-cr-00107-JLS | USA v. Kuhns | |
| 25 | | 8:20-cr-00108-JVS | USA v. Anderson | |
| 26 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 27 | Sept. 16, 2020 | 8:20-cr-00133-AB | USA v. Lewis, et al. | |
| 28 | | 8:20-cr-00134-SVW | USA v. Ramirez | |
| 29 | | 8:20-cr-00135-ODW | USA v. Chacon | |
| 30 | | 8:20-cr-00136-SVW | USA v. Mitchell | |
| 31 | | 8:20-cr-00137-DSF | USA v. Van Dyke | |
| 32 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 33 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 34 | Sept. 30, 2020 | 8:20-cr-00140-VAP | USA v. Hicks | |
| 35 | | 8:20-cr-00141-JAK | USA v. Jeffries | |
| 36 | | 5:20-cr-00186-DMG | USA v. Jones | |
| 37 | | 5:20-cr-00187-PA | USA v. Lawhead | |
| 38 | | 8:20-cr-00142-SB | USA v. Wampler | |
| 39 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 40 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 41 | REDACTED | REDACTED | REDACTED | Filed Under Seal |

|  | Date Indictment Filed | Case Number | Case Name | Notes |
|---|---|---|---|---|
| 42 | October 14, 2020 | 8:20-cr-00152-JVS | USA v. Swain | |
| 43 | | 8:20-cr-00153-CJC | USA v. Pham | |
| 44 | | 8:20-cr-00154-PA | USA v. Arias | |
| 45 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 46 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 47 | October 28, 2020 | 8:20-cr-00160-RGK | USA v. Chavez, et al. | |
| 48 | | 8:20-cr-00161-PA | USA v. Talamantes | |
| 49 | | 8:20-cr-00162-SB | USA v. Rangel | |
| 50 | November 4, 2020 | 8:20-cr-00169-JVS | USA v. Miramontes | |
| 51 | | 8:20-cr-00170-CJC | USA v. Hall | |
| 52 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 53 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 54 | | 8:20-cr-00177-DSF | USA v. Vargas-Fentanes | |
| 55 | | 8:20-cr-00178-MWF | USA v. Garcia | |
| 56 | | 8:20-cr-00179-GW | USA v. Oquendo | |
| 57 | December 2, 2020 | 8:20-cr-00183-JVS | USA v. Crow | |
| 58 | | 8:20-cr-00184-CJC | USA v. Lee | |
| 59 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 60 | December 9, 2020 | 8:20-cr-00189-GW | USA v. Zermeno | |
| 61 | | 8:20-cr-00190-PA | USA v. Hall | |
| 62 | | 8:20-cr-00191-JFW | USA v. Procopio | |
| 63 | | 8:20-cr-00192-VAP | USA v. Cerda | |
| 64 | | 8:20-cr-00193-RGK | USA v. Roche | |
| 65 | REDACTED | REDACTED | REDACTED | Filed Under Seal |

# EXHIBIT 2

## Jury Trials Completed in Orange County Superior Court

| MEASURE | | CY 2020 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | JUN | JUL | AUG | SEP | OCT | *NOV | TOTAL |
| Jury Trials | Civil | n/a | n/a | n/a | 4 | 10 | 5 | 19 |
| | Criminal - Felony | 4 | 4 | 15 | 14 | 6 | 3 | 46 |
| | Criminal - Misdemeanor | 11 | 9 | 12 | 13 | 10 | 10 | 65 |
| | TOTAL | 15 | 13 | 27 | 31 | 26 | 18 | 130 |
| Court Trials | Civil | n/a | n/a | n/a | 4 | 10 | 5 | 19 |
| | Criminal - Felony | 0 | 1 | 0 | 0 | 1 | 6 | 8 |
| | Criminal - Misdemeanor | 0 | 0 | 0 | 1 | 0 | 2 | 3 |
| | Mental Health | 15 | 7 | 20 | 7 | 9 | 10 | 68 |
| | Probate | 7 | 13 | 8 | 6 | 8 | 3 | 45 |
| | TOTAL | 22 | 21 | 28 | 18 | 28 | 26 | 143 |

* Count totals include all cases that began/initiated during the respective reporting month.
* November 2020 total is for a partial month, covering 11/01/01 thru 11/13/20.

## Juror Reporting Statistics in Orange County Superior Court

| | Jurors Summoned | Jurors Asked to Report | Jurors Reported | % Reported |
|---|---|---|---|---|
| **April** (Court Closed) | 36,212 | 0 | 0 | **0%** |
| **May** (Court Closed) | 42,850 | 0 | 0 | **0%** |
| **June** | 40,378 | 3,057 | 1,943 | **64%** |
| **July** | 61,716 | 2,047 | 1,265 | **62%** |
| **August** | 54,008 | 4,381 | 1,971 | **45%** |
| **September** | 58,077 | 4,709 | 2,865 | **61%** |
| **Totals** | **293,241** | **14,194** | **8,044** | **57%** |

**CENTRAL JUSTICE CENTER - JURY TRIALS HELD = 9**

| Date | Day of the Week | Total # Targeted | Total # Called-In | Total # Attended | Total # FTA | FTA RATE | APPEARANCE RATE |
|---|---|---|---|---|---|---|---|
| 11/1/2020 | Sunday | | | | | | |
| 11/2/2020 | Monday (AM) | 160 | 276 | 197 | 79 | 29% | 71% |
| 11/3/2020 | Tuesday (AM) | 40 | 88 | 45 | 43 | 49% | 51% |
| 11/3/2020 | Tuesday (PM) | 45 | 107 | 52 | 55 | 51% | 49% |
| 11/4/2020 | Wednesday (AM) | 120 | 233 | 124 | 109 | 47% | 53% |
| 11/4/2020 | Wednesday (PM) | 120 | 296 | 135 | 161 | 54% | 46% |
| 11/5/2020 | Thursday | 30 | 88 | 52 | 36 | 41% | 59% |
| 11/6/2020 | Friday | 0 | 0 | 0 | 0 | 0% | 0% |
| 11/7/2020 | Saturday | | | | | | |
| 11/8/2020 | Sunday | | | | | | |
| 11/9/2020 | Monday | 0 | 0 | 0 | 0 | 0% | 0% |
| 11/10/2020 | Tuesday | 120 | 255 | 156 | 99 | 39% | 61% |
| 11/11/2020 | Wednesday | | | | | | |
| 11/12/2020 | Thursday | 55 | 130 | 67 | 63 | 48% | 52% |
| 11/13/2020 | Friday | 30 | 60 | 39 | 21 | 35% | 65% |
| 11/14/2020 | Saturday | | | | | | |
| 11/15/2020 | Sunday | | | | | | |
| 11/16/2020 | Monday (AM) | 40 | 90 | 49 | 41 | 46% | 54% |
| 11/16/2020 | Monday (PM) | 40 | 90 | 49 | 41 | 46% | 54% |
| 11/17/2020 | Tuesday | 115 | 275 | 149 | 126 | 46% | 54% |
| 11/18/2020 | Wednesday | 70 | 198 | 111 | 87 | 44% | 56% |
| 11/19/2020 | Thursday | 40 | 100 | 54 | 46 | 46% | 54% |
| 11/20/2020 | Friday | 0 | 0 | 0 | 0 | 0% | 0% |
| 11/21/2020 | Saturday | | | | | | |
| 11/22/2020 | Sunday | | | | | | |
| 11/23/2020 | Monday | 0 | 0 | 0 | 0 | 0% | 0% |
| 11/24/2020 | Tuesday | 0 | 0 | 0 | 0 | 0% | 0% |
| 11/25/2020 | Wednesday | 0 | 0 | 0 | 0 | 0% | 0% |
| 11/26/2020 | Thursday | | | | | | |
| 11/27/2020 | Friday | | | | | | |
| 11/28/2020 | Saturday | | | | | | |
| 11/29/2020 | Sunday | | | | | | |
| 11/30/2020 | Monday | 80 | 192 | 119 | 73 | 38% | 62% |
| | **TOTALS** | **1,105** | **2,478** | **1,398** | **1,080** | **44%** | **56%** |

**WEST JUSTICE CENTER - JURY TRIALS HELD = 7**

| Date | Day of the Week | Total # Targeted | Total # Called-In | Total # Attended | Total # FTA | FTA RATE | APPEARANCE RATE |
|---|---|---|---|---|---|---|---|
| 11/3/2020 | Tuesday | 40 | 79 | 54 | 25 | 32% | 68% |
| 11/4/2020 | Wednesday | 40 | 77 | 49 | 28 | 36% | 64% |
| 11/5/2020 | Thursday | 40 | 76 | 47 | 29 | 38% | 62% |
| 11/9/2020 | Monday (AM) | 40 | 80 | 49 | 31 | 39% | 61% |
| 11/9/2020 | Monday (PM) | 40 | 86 | 46 | 40 | 47% | 53% |
| 11/10/2020 | Tuesday (AM) | 40 | 83 | 57 | 26 | 31% | 69% |
| 11/10/2020 | Tuesday (PM) | 40 | 86 | 52 | 34 | 40% | 60% |
| 11/12/2020 | Thursday | 40 | 77 | 44 | 33 | 43% | 57% |
| 11/17/2020 | Tuesday | 40 | 87 | 59 | 28 | 32% | 68% |
| 11/18/2020 | Wednesday (AM) | 40 | 75 | 47 | 28 | 37% | 63% |
| 11/18/2020 | Wednesday (PM) | 40 | 83 | 51 | 32 | 39% | 61% |
|  | TOTALS | 440 | 889 | 555 | 334 | 38% | 62% |

**HARBOR JUSTICE CENTER - JURY TRIALS HELD = 3**

| Date | Day of the Week | Total # Targeted | Total # Called-In | Total # Attended | Total # FTA | FTA RATE | APPEARANCE RATE |
|---|---|---|---|---|---|---|---|
| 11/2/2020 | Monday | 40 | 79 | 44 | 35 | 44% | 56% |
| 11/3/2020 | Tuesday | 40 | 74 | 41 | 33 | 45% | 55% |
| 11/12/2020 | Thursday | 40 | 73 | 43 | 30 | 41% | 59% |
|  | TOTALS | 120 | 226 | 128 | 98 | 43% | 57% |

# EXHIBIT 3



# Superior Court of California
## County of Orange

### News Release

Public Information Office
Contact:  Kostas Kalaitzidis, 657-622-7097
PIO@occourts.org

Oct. 20, 2020

### Orange County Superior Court Celebrates Special
### Juror Appreciation Week October 26–30, 2020

**Santa Ana, CA –** The Orange County Superior Court will celebrate and recognize our county's citizens who answered the call of duty and stepped up to serve on juries during the pandemic, with a special Juror Appreciation Week from October 26 to October 30.

"The fact that we held 100 jury trials since the partial reopening of the Court in May is a testament to the commitment of our citizens to the Constitution and our shared values. Jurors are an integral part of our justice system, they guarantee the right to a trial where all can be heard and judged by their peers," said **Orange County Presiding Judge Kirk Nakamura**. "We could not have provided access to justice through jury trials during this pandemic if not for the great response of our citizens," he added.

The Court resumed criminal trials in May, kicking off the **"Safe Access to Justice Initiative,"** a program designed to assure strict enforcement of safety precautions in order to protect jurors and all members of the public who enter Court facilities.

"I was impressed by the way everyone went out of their way to do their best during these trying COVID times," said **Jodi Greenbaum, an Orange County citizen,** who answered the call to serve our community as a juror. "First, Judge Cynthia Herrera set a professional and caring tone by speaking to us about our duty as jurors. Twice, Judge Jeannie Joseph called us in to tell us that even though we weren't chosen as jurors, we served an important purpose," Ms. Greenbaum added.

"It wasn't just the judges. Everyone in the courthouse showed kindness, from the deputies at the entrance to the workers, who smiled, cleaned down the courtroom and explained simple directions as if they were doing it for the first time," she stressed.

**Judge Thomas Delaney,** who leads the **"Safe Access to Justice Initiative,"** noted the Court's commitment to keeping everyone healthy and safe.  "As we conduct jury trials, we are also implementing strict cleaning procedures and physical distancing protocols to support the health and wellness of everyone that enters Court facilities," he said.

Meanwhile, the Court is capitalizing on the use of technology to significantly reduce the number of jurors summoned to serve.

"We are using cutting edge technology and data analysis to create efficiencies that will allow the Court to reduce the overall number of jurors needed to provide access to justice," said **Court Executive Officer and Jury Commissioner David Yamasaki**. "We will be able to reduce the numbers of jurors

---

summoned to the point that fairly soon, any citizen who serves in Orange County can expect to be called to serve no more than once every two years."

As the pandemic is continuing to hamper Court operations, and to alleviate concerns regarding physical distancing, the Court recently implemented a mobile device self-check-in process for jurors. "Our jurors may now choose to skip the check-in line altogether and have a seat directly in the jury assembly room," said **Jury Services Manager Pete Hernandez**, adding "By accessing a dedicated Court network for jurors on their mobile device, they can self-check-in for service and obtain access to the free WiFi. All they need to use is their 9-digit juror ID number that is printed on their summons. It's as simple as that."

In pre-COVID times, millions of Californians statewide participated in jury service. Last year:

- About 9 million people were summoned to jury service, over 652,000 in Orange County alone;
- Over 4 million prospective jurors were eligible and available to serve;
- Approximately 80 percent of prospective jurors completed service in one day; and
- In Orange County, more than 900 jury trials (criminal and civil) were held in the past few years.

The recognition and appreciation for jurors usually takes place the second week of May, established as Juror Appreciation Week by a special resolution passed by the California Legislature in 1998 to acknowledge the important contributions of citizens who devote their time and effort in making the cherished right of trial by jury a reality. The pandemic forced the Court to forego the planned celebrations in May and move them to October.

For more information on jury service, visit www.occourts.org and click on "Jury Service," or visit the Jury Service section of the California Courts website.

# # #

# EXHIBIT 4

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF ORANGE**

| | | |
|---|---|---|
| In Re: | ) | **IMPLEMENTATION ORDER** |
| **COVID-19 Pandemic** | ) | **RE: CRIMINAL EMERGENCY** |
| | ) | **RELIEF AUTHORIZED BY** |
| | ) | **GOVERNOR EXECUTIVE** |
| | ) | **ORDER AND BY THE** |
| | ) | **JUDICIAL COUNCIL OF** |
| | ) | **CALIFORNIA** |
| | ) | |
| **January 7, 2021** | ) | |
| | ) | |
| | ) | |
| | ) | |

Exercising the authority granted by Governor Gavin Newsom's Executive Order N-38-20 and the January 7, 2021 Order of Chief Justice Tani Cantil-Sakauye issued in response to the January 5, 2021 Request for a Judicial Emergency Order made by the Superior Court or Orange County ("Court"), this Court HEREBY FINDS AND ORDERS THE FOLLOWING ADDITIONAL MEASURES:

      1.    The Court extends the time period provided in Penal Code section 825 within which a defendant charged with a felony offense must be taken before a magistrate from 48 hours to not more than 7 days in cases in which the statutory deadline otherwise would expire from 1/11/2021 to 2/5/2021, inclusive. (Gov. Code, § 68115(a)(8).)

      3.    The Court extends the time period provided in section 1382 of the Penal Code for the holding of a criminal trial by not more than 30 days in cases in which the

statutory deadline otherwise would expire from 1/11/2021 to 2/5/2021, inclusive.  (Gov.

Code, § 68115(a)(10).)

It is the intent of this Order to provide the maximum length of constitutionally

permitted continuance days authorized by the January 7, 2021 Order of Chief Justice Tani

Cantil-Sakauye issued in response to the January 5, 2021 Request for a Judicial Emergency

Order made by the Court.  Any conflicts in the above language are to be resolved in favor of

granting the lengthier of the continuance options.


THIS ORDER IS EFFECTIVE IMMEDIATELY.

Dated: ____1/7/2021____                         _____

                                                Erick L. Larsh, Presiding Judge